In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00070-CV
_____

**MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS L.P., MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS (BERMUDA) L.P. AND MATLINPATTERSON GLOBAL OPPORTUNITIES PARTNERS B, L.P., Appellants**

**V.**

**DEUTSCHE BANK SECURITIES, INC. AND CREDIT SUISSE SECURITIES (USA) LLC, Appellees**

**On Appeal from the 9th District Court
Montgomery County, Texas
Trial Cause No. 12-06-06544-CV**

**MEMORANDUM OPINION**

This appeal by MatlinPatterson Global Opportunities Partners L.P., MatlinPatterson Global Opportunities Partners (Bermuda) L.P., and MatlinPatterson Global Opportunities Partners B, L.P., (collectively "MatlinPatterson") from an order granting the plea to the jurisdiction filed by the appellees, Deutsche Bank Securities Inc. and Credit Suisse Securities (USA) LLC

(collectively "Banks"), presents two issues. First, we must decide whether MatlinPatterson may pursue a fraud claim against the Banks for making material misrepresentations concerning the financing of a failed merger between Hexion Specialty Chemicals, Inc. (a subsidiary of Apollo Management Holdings, L.P.) ("Hexion") and Huntsman Corporation ("Huntsman"). Second, we must decide whether the trial court erred in dismissing the suit with prejudice. We hold that MatlinPatterson presented a derivative claim that it lacks standing to pursue and the jurisdictional defect cannot be cured by re-pleading. Accordingly, we affirm the judgment.

## Background

Two companies, Basell AF ("Basell") and Hexion, sought to acquire Huntsman, a publicly traded Delaware corporation. Each prospective buyer proposed a "cash-out merger" in which all Huntsman shareholders would receive the negotiated price per share of stock. Each merger proposal required the consent of the holders of a majority of Huntsman's shares. At the time, MatlinPatterson was a major shareholder of Huntsman and its nominees held two positions on Huntsman's ten-member board of directors. MatlinPatterson and Huntsman Family Holdings, who together held approximately 59% of the corporation's stock under control of the HMP [Huntsman MatlinPatterson] Equity Trust, entered into a voting agreement in favor of the Basell merger. A party other than the Banks

2

would have financed the Basell merger. Huntsman signed a merger agreement with Basell. The merger agreement expressly excluded third-party beneficiaries but provided that Huntsman's stockholders had a right to enforce their rights to receive the merger consideration upon consummation of the merger in the event the merger was consummated.

Hexion raised its bid and during negotiations communicated to Huntsman the terms of the Banks' commitment letter, which promised to lend the full merger funds. The Hexion merger agreement expressly disclaimed the existence of third-party beneficiaries. Huntsman's board of directors unanimously determined that the Hexion merger agreement and the merger were in the best interests of the holders of Huntsman common stock. Huntsman's definitive proxy statement included a disclosure that a Huntsman stockholder was not a third-party beneficiary of the merger agreement and could not enforce any of its terms. The definitive proxy statement also disclosed that MatlinPatterson and the Huntsman family entered into agreements with Hexion to vote an aggregate of approximately 32.2% of Huntsman's common stock in favor of the merger with Hexion. Huntsman terminated the Basell agreement and signed a merger agreement with Hexion. In addition to the merger agreement, Huntsman entered into an amended registration agreement with MatlinPatterson, and filed a shelf registration

3

statement registering for resale all of MatlinPatterson's Huntsman shares. MatlinPatterson sold 56,979,062 Huntsman shares on August 6, 2007.

On June 18, 2008, Hexion sued Huntsman for a declaration (1) that the merger could not be closed because the combined company would be insolvent and (2) that Hexion's performance was excused because Huntsman suffered a material adverse effect. *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 721-22, 736 (Del. Ch. 2008). Huntsman filed a counterclaim for breach of the merger agreement and requested specific performance. *Id.* at 746, 759. The court found that Hexion knowingly and intentionally breached the merger agreement in part by providing the Banks with an insolvency opinion without Huntsman's consent. *Id*. at 746, 751-52, 756. The court declined to resolve the issue of whether the combined entity would be solvent because the issue was not ripe for judicial determination. *Id.* at 758. Finally, the court ruled that the contract excluded the remedy of specific performance of Hexion's obligation to consummate the merger, but granted a judgment ordering Hexion to specifically perform its other obligations under the contract. *Id.* at 761-63.

After obtaining the judgment against Hexion, Huntsman sued the Banks. Huntsman alleged, inter alia, that the Banks fraudulently induced Huntsman to terminate the Basell merger and enter into a merger agreement with Hexion. In its petition, Huntsman alleged: (1) Apollo and the Banks knew Huntsman's board had

4

a fiduciary duty to consider any bid likely to result in a superior value to its shareholders; (2) Apollo's commitment to close the merger at the higher price and the Banks' firm funding commitment was the critical issue in the Hexion merger negotiations; (3) a successful syndication of the merger debt was not a condition to the Banks' commitment to fund the full amount of the merger consideration at closing; (4) the Banks secretly demanded a dramatically reduced funding commitment from Apollo; (5) Apollo, Hexion, and the Banks assured Huntsman there were no undisclosed conditions to the funding commitment; (6) Huntsman's transaction committee supported the Hexion merger in part due to the absence of a material adverse effect provision; (7) before signing the commitment letter, the Banks extracted assurances from Apollo that the Banks would be protected against losses on the financing; (8) Apollo and the Banks secretly agreed that the proceeds of nearly $1 billion of planned asset sales and divestitures would be credited against the committed financing in the form of a reduction in the amount that could be drawn on the financing; (9) before signing the commitment letters, Apollo and the Banks agreed the capped interest rates were illusory and they fully intended to adjust the rates; (10) the Banks lacked the ability to fund the commitment without violating their lending limits; (11) Hexion agreed to pay the Basell breakup fee and a "ticking fee" that secretly created a funding gap; (12) Apollo secretly assured the Banks that it would sell down the Banks' exposure prior to closing; and (13) the

5

Banks knew Hexion's representation that the committed financing was adequate to fund the acquisition was materially false when it was made, that there were multiple undisclosed material conditions to the financing, and that Hexion falsely represented that it had no knowledge of any circumstances reasonably likely to result in the funding not being made available. Huntsman alleged that Apollo, in furtherance of its secret agreement to protect the Banks from losses and in order to provide the Banks with a defense to enforcement of the financing commitment, obtained an opinion that the merger would render the combined entity insolvent and filed suit for declaratory judgment.

In a motion for summary judgment, the Banks argued that Huntsman could not recover as fraud damages the benefit of the merger consideration that would flow to the stockholders, not to Huntsman. In response, Huntsman noted that the Banks had previously taken the position that Huntsman would have a claim for money damages if the Hexion merger failed to close due to someone's fault, and argued that its shareholders lack standing to assert rights under the merger agreement because they received no third-party rights. The trial court denied the motion for summary judgment on Huntsman's claim for common law fraud.

On or about June 23, 2009, Huntsman and the Banks settled the Huntsman lawsuit in the midst of trial. The Banks paid Huntsman $620 million, agreed to reimburse Huntsman for as much as $12 million in litigation costs, and agreed to

$1.1 billion in debt financing. Huntsman released the Banks on behalf of Huntsman and its stockholders, and agreed to indemnify the Banks from the released claims.

MatlinPatterson sold 1,265,602 shares of Huntsman common stock on October 15, 2009, and no longer owns or controls any common stock in Huntsman. MatlinPatterson filed this suit on June 18, 2012. MatlinPatterson makes the following allegations in its petition: (1) the Banks made materially false representations about the nature of the financing for the Huntsman merger for the purpose of inducing MatlinPatterson to abandon the Basell merger and support the Hexion merger; (2) the Banks knew MatlinPatterson would rely on the misrepresentations given its significant ownership of Huntsman stock and its employees' positions on the Huntsman board; (3) MatlinPatterson relied on the Banks' representations in deciding to abandon the one merger for the other; (4) the Banks were aware the misrepresentations were false when they were made; and (5) MatlinPatterson was damaged by its reliance on the Banks' false representations. The Banks' plea to the jurisdiction urged that any fraud claim belonged solely to Huntsman. The trial court granted the plea to the jurisdiction.

**Plea to the Jurisdiction**

We review de novo a trial court's ruling on a plea to the jurisdiction because the dismissal of a case for lack of subject matter jurisdiction is a question of law.

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "[W]hether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law." *Id.* "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227. "When the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case[.]" *Id.* In situations where the jurisdictional challenge implicated the merits of the plaintiffs' cause of action and the plea to the jurisdiction included evidence, in reviewing the trial court's ruling on a plea to the jurisdiction, we construe the pleadings liberally in favor of the plaintiff and determine if the plaintiff alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Id.* at 226-27.

## Direct or Derivative Action

MatlinPatterson argues Texas law determines who owns the fraud claims alleged by MatlinPatterson. Texas law provides that the law of the state of incorporation governs the internal affairs of a corporation. *See* Tex. Bus. Orgs. Code Ann. § 1.102 (West 2012). Internal affairs of a corporation include (1) the

8

rights, powers, and duties of the corporation's governing authority, governing persons, officers, owners, and members; and (2) matters relating to the corporation's membership or ownership interests. *See id.* § 1.105. MatlinPatterson contends the false representations in the commitment letter caused MatlinPatterson to commit its voting and sale rights to the Hexion merger, without which the deal would not have gone forward. As a result, MatlinPatterson gave up the price it would have otherwise received for the disposition of its own assets, namely, its Huntsman shares. The voting rights and the sale rights are incidents of MatlinPatterson's status as a shareholder of Huntsman. Because the rights and powers of a corporation's shareholders are determined by the law of the state of incorporation, we apply Delaware law to determine whether MatlinPatterson's fraud claim is a derivative claim. *See id.* §§ 1.102, 1.105.

Delaware law uses a two-part analysis to distinguish between direct and derivative actions. *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). In making this determination, the court first considers who suffered the alleged harm—the corporation, or the suing stockholders, individually. *Id.* Second, the court considers who would receive the benefit of any recovery— the corporation, or the stockholders, individually. *Id.* "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* at 1039. We must determine whether the stockholder demonstrated "the duty

9

breached was owed to the stockholder" and whether the stockholder "can prevail without showing an injury to the corporation." *Id.* "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature." *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008). This rule applies even where the alleged harm is ultimately suffered by the stockholders. *Id.* "In order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large." *Id.*

MatlinPatterson argues the Banks' false assurances that they would fund Hexion's merger with Huntsman harmed MatlinPatterson in its individual capacity because MatlinPatterson voted to have Huntsman abandon the Basell merger and execute the Hexion merger. As a result, MatlinPatterson argues, it gave up the price it would have received for its Huntsman stock and suffered expectancy damages in the form of the proceeds that Hexion would have paid to MatlinPatterson if the merger had closed.

After review of the record, we conclude that as a result of its reliance on the commitment letter that failed to disclose the material terms of the merger financing, MatlinPatterson suffered the harm suffered by all Huntsman stockholders in proportion to their common stock ownership. Additionally, MatlinPatterson's support for the merger affected all of Huntsman's stockholders

10

in proportion to their common stock ownership. The harm suffered by MatlinPatterson was also suffered by Huntsman—Huntsman's board of directors relied on the commitment letter when it abandoned the Basell transaction, agreed to pay the termination fee in the Basell merger agreement, agreed to reimburse MatlinPatterson for certain fees MatlinPatterson would owe upon the closing of the Hexion merger, recommended that all Huntsman shareholders vote for the Hexion merger, and agreed to merge with Hexion.

MatlinPatterson contends it seeks to vindicate its own voting and sale rights, but every Huntsman stockholder possessed voting and sale rights in connection with the adoption of the merger agreement by Huntsman. MatlinPatterson alleged it was unique among Huntsman's shareholders because its position was sufficiently large enough to veto the proposed merger, but any injury resulting from MatlinPatterson's decision to support the merger affected all of Huntsman's stockholders similarly in proportion to their common stock ownership, and Huntsman absorbed MatlinPatterson's liability for its lack of performance of MatlinPatterson's voting agreement with Basell. Because MatlinPatterson has not alleged individualized harm not suffered by the corporation or by the stockholders at large, the claim is derivative under Delaware law. *See id.*

We reach the same result under Texas law. MatlinPatterson contends it has a claim for injury to its own legal rights under Texas law because its complaint

11

concerns a fraud directed against it personally, as a powerful shareholder whose support was critical to the success of the Banks' scheme. A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though it may be injured by that wrong, but it may recover damages for a wrong done to it personally for a duty owed directly by a wrongdoer to the stockholder. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990).

A corporate shareholder may have an action for personal damages where the wrongdoer violates a duty owing directly to the stockholder, provided the stockholder personally is the beneficiary of the contract or other liability. *See In re Enron Corp.*, 292 B.R. 507, 511-12 (Bankr. S.D.N.Y. 2002) (applying Texas law and holding that third-party beneficiaries, including stockholders, could directly sue breaching buyer to enforce third-party beneficiary rights provided for in the merger agreement). Where "each shareholder suffers relatively in proportion to the number of shares he owns," however, "each will be made whole if the corporation obtains restitution or compensation from the wrongdoer." *Massachusetts v. Davis*, 168 S.W.2d 216, 221 (Tex. 1942); *see also Schoellkopf v. Pledger*, 739 S.W.2d 914, 918-20 (Tex. App.—Dallas 1987), *rev'd on other grounds*, 762 S.W.2d 145 (Tex. 1988) (noting stockholder had a personal defense for being fraudulently induced into signing guaranty but he could not sue to recover the value of his stock

from the co-guarantor because the tortious interference claim belonged only to the corporation).

MatlinPatterson argues it seeks to pursue a personal claim because its voting rights in Huntsman were affected by the voting agreement MatlinPatterson made with Hexion in reliance on the misrepresentations in the Banks' commitment letter. The Banks' false representation, that they would fully fund the Hexion merger if a majority of Huntsman's shares were voted to support the Hexion merger, damaged MatlinPatterson by adversely affecting the price it received for Huntsman's common stock. The harm was not to MatlinPatterson's voting rights, which it exercised; rather, the wrong was directed toward the corporation, which by the cumulative vote of all its shareholders abandoned the Basell merger for the Hexion merger, and was suffered by the corporation and all of its shareholders in proportion to their ownership of Huntsman's common stock.

To recover individually under Texas law, "a stockholder must prove a personal cause of action and personal injury." *Wingate*, 795 S.W.2d at 719. The Banks allegedly made misrepresentations the Banks knew would be relied upon by MatlinPatterson, but the fraud was obtaining Huntsman's agreement to merge with Hexion under terms that in reality were less advantageous than the Banks represented they were. That was conduct directed towards Huntsman, through its stockholders who each had the right to vote for or against the competing merger

13

agreements, not MatlinPatterson. Accordingly, we conclude MatlinPatterson's claim is not only a derivative claim under Delaware law, but is also a derivative claim under Texas law. We overrule issue one.

## Dismissal with Prejudice

MatlinPatterson contends that the trial court erred in dismissing the suit with prejudice. If the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Miranda*, 133 S.W.3d at 227. MatlinPatterson's post-submission brief contends that if we remand the case it would disclaim any recovery based on harm to Huntsman assets—including corporate accounts, operations, reputation, and creditworthiness—and asserts what it argues are claims for its direct injuries: (1) the lost opportunity to obtain the Basell merger consideration; (2) the lost opportunity to sell the Huntsman stock that was committed through the Hexion voting agreement; (3) the lost opportunity to obtain the Hexion merger consideration; (4) the lost opportunity to obtain a premium for control of Huntsman; and (5) the time-value of the money from its lost opportunities. These injuries necessarily derive from wrongful acts of the Banks that caused Huntsman to fail to complete a merger, which harmed Huntsman's stockholders relatively in proportion to the number of shares owned, and not from the Banks' breach of an independent duty to MatlinPatterson. *See Feldman*, 951 A.2d at 733; *Wingate*, 795

S.W.2d at 719. If allowed to replead, MatlinPatterson's complaints remain complaints that do not concern an individualized harm not suffered by all of the stockholders at large. *Feldman*, 951 A.2d at 733. Because MatlinPatterson's pleadings and the undisputed evidence of jurisdictional facts affirmatively negate jurisdiction, the trial court did not err in dismissing the suit with prejudice without first allowing MatlinPatterson to amend its pleadings. *Miranda*, 133 S.W.3d at 227. We overrule issue two and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on November 7, 2013
Opinion Delivered May 15, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.

15